**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| T.D.F., a minor, by his mother BEATRICE LINK, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>) CASE NO. 11 CV 3317<br>CAROLYN W. COLVIN, Acting Commissioner )<br>of the Social Security Administration, ) Judge Robert M. Dow, Jr.<br>)<br>Defendant. )<br>) | |

**MEMORANDUM OPINION AND ORDER**

*Pro se* Plaintiff Beatrice Link, on behalf of her minor son, T.D.F. ("TDF"), applied for supplemental security income from the Social Security Administration ("SSA") on August 30, 2007. After a series of administrative proceedings and appeals, including a hearing in June 2009 before an administrative law judge ("ALJ"), the ALJ issued a finding that TDF was not disabled or entitled to supplemental security income. In January 2011, the Appeals Council denied Ms. Link's request for review of the ALJ's decision, rendering that decision the final decision of the Commissioner of the SSA for purposes of judicial review. 20 C.F.R. § 404.981. Ms. Link then filed this action under 42 U.S.C. § 405(g), requesting that the Court review the ALJ's denial of benefits.

The Commissioner seeks a judgment upholding the denial of benefits [37], maintaining that the ALJ's decision is supported by substantial evidence. After several lengthy extensions of time, Plaintiff filed her response to the Commissioner's motion, noting that while treatment has helped her son, the combined effects of ADHD, depression, and psychosis render him disabled and entitled to supplemental security income. Having considered the parties' briefs as well as

the administrative record, the Court grants the Commissioner's motion [37] and affirms the decision of the Administrative Law Judge.

I.  **Facts**

   A.  **Procedural Background**

TDF was born on June 14, 1998, and was just shy of 11 at the time of his hearing on June 11, 2009. At the time of the hearing, he was in fifth grade. He is considered to be a child under the Social Security regulations and has been so at all relevant times. Prior the hearing, Plaintiff Beatrice Link, on behalf of her son TDF, applied for supplemental security income from the Social Security Administration ("SSA"), alleging that TDF had become disabled on August 30, 2007, due to attention deficit hyperactive disorder ("ADHD") and an affective mood disorder ("depression"). TDF's application was denied initially on November 2, 2007, and upon reconsideration on March 18, 2008. Both notices stated that, while TDF does have some functional restrictions, he did not have an impairment or combination of impairments that resulted in marked or severe functional limitations.

   B.  **Relevant Medical Evidence**

On October 11, 2007, TDF saw Erwin J. Baukus, Ph.D., for a psychological examination. Dr. Baukus noted that TDF was nine years old and in the fourth grade. According to Dr. Baukus, TDF was in regular mainstream classes and had never been held back or suspended from school. TDF's mother told Dr. Baukus that TDF had never seen a mental health professional and was not taking any medication. Dr. Baukus diagnosed TDF as "Chronic Depression of Childhood with Agitation; Parent/Child Relationship Problems."

On October 29, 2007, Linda Lanier, Ph.D., reviewed TDF's school and medical records and then completed a Childhood Disability Evaluation Form. Dr. Lanier opined that TDF had a

severe impairment, but that he did not have an impairment that medically equaled or functionally equaled an impairment described in the Listings of Impairments. She noted that TDF had not received treatment for a behavior or attention deficit disorder and that his mother was "not willing to cooperate with the schools suggestions."

On November 27, 2007, TDF entered a partial hospital program for anger management. The report indicated that an evaluation was previously done at the University of Illinois, Chicago ("UIC"), which led to a diagnosis of attention deficit hyperactivity disorder ("ADHD"), but that the UIC doctors who examined TDF felt that the condition was not significant enough to start him on medication. Patricia Roy, M.D., who submitted the November 27 report, diagnosed ADHD and recommended stimulant medication to control TDF's anger. Dr. Roy identified TDF's weaknesses as difficulty with controlling anger and possible auditory and visual hallucinations. She identified TDF's strengths as his cognitive abilities and intelligence within normal limits and noted that he had the capacity for treatment.

On March 17, 2008, state agency psychologist, Joseph Mehr, Ph.D., reviewed the record and opined, as did Dr. Lanier, that while TDF had a severe impairment, he did not have an impairment that medically equaled or functionally equaled an impairment described in the Listings of Impairments. Dr. Mehr noted that his partial hospitalization and current medications improved his behavior and performance at school.

On April 2, 2008, TDF underwent a psycho-educational evaluation with Brian C. Malliett, M.A., a school psychologist. This testing showed that TDF's academic achievement was in the average range in math calculation skills, and his reading ability was comparable to that of the average individual at age 8-6 (TDF was 9 years, 10 months old at the time of testing). In his summary, Mr. Malliett wrote that TDF's academic skills were in the average range of

3

others at his age level. Mr. Malliett also reported that when compared to others at his age level, TDF's performance was average in mathematics and math calculation skills; low average in broad reading and written expression; and low in written language.

### C. The Hearing on June 11, 2009

On June 11, 2009, Administrative Law Judge Steven H. Templin conducted a hearing regarding TDF's denial of supplemental security income benefits. Present at the hearing were TDF and his mother, Beatrice Link, as well as TDF's representative, Steven Weinstein, and the medical expert, Dr. Kathleen O'Brien.

#### 1. Testimony of medical expert Dr. Kathleen O'Brien

During the hearing, Dr. Kathleen O'Brien testified that TDF suffered from attention deficit hyperactivity disorder (ADHD), as well as a depressive disorder. She noted that mental health professionals were treating TDF's conditions with medication and counseling. Dr. O'Brien added that TDF had learning disorders or some difficulties in the areas of reading, written language, and mathematics. She testified that while these impairments constituted severe impairments, they had not been shown to meet or equal in severity the criteria of any impairment found in the Listing of Impairments. Instead, once TDF started receiving treatment, he started to make progress. Dr. O'Brien referred to a school report and noted that while his teachers describe TDF's behavior as "somewhat peculiar," it was not rising to the same level of anger and acting out as it did prior to treatment.

Before turning to the specific domains,[1] the ALJ specifically inquired about TDF's (1) cognitive and communicative functioning; (2) social functioning; and (3) difficulties in concentration, persistence, and pace. Dr. O'Brien replied that, to a certain extent, her answer

---

[1] As set forth below, the determination of functional equivalency in assessing whether a child is disabled under the Act involves evaluating six "domains" from an age-appropriate standpoint.

4

depended on whether TDF was medicated or not. Dr. O'Brien testified that if TDF was not medicated, then he probably would have a "marked" limitation in concentration, persistence, and pace, but not in the other areas. Dr. O'Brien further noted that prior to being diagnosed and taking medication, TDF had "marked" hyperactivity and hyperactive impulsiveness. She commented that TDF possessed many of those symptoms as recently as late 2007. However, as of April 2008—following counseling and medication—TDF's school reported that he had improved in these areas. Dr. O'Brien also identified "moderate" problems with personal (or social) functioning and "mild" problems with cognitive communication. Here, Dr. O'Brien commented that, prior to receiving treatment, TDF's ADHD impacted him in a very negative way. However, she added that TDF possessed the capacity to improve because he is "a very, very bright young man" and that he noticeably improved after he began treatment.

After the general exchange, the ALJ focused Dr. O'Brien on each of the six specific domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. Dr. O'Brien testified that TDF has "less than marked" limitations in acquiring and using information—definitely after the medication but she also testified that it was "less than marked" without the medication because TDF is "so bright that he accommodates very well." She noted that attending to and completing tasks constituted TDF's most significant issue prior to treatment. She observed that he works "very, very hard at staying on task" and that since receiving treatment, any limitation is "less than marked." She further noted that she was glad he was not present during her testimony, because "his perception of his achievements is that he's doing really well. He talks about doing really well and feels very good about himself."

5

With respect to interacting and relating with others, Dr. O'Brien testified that TDF had been experiencing behavior problems. She noted that with medication, "some of that seems to have cleared up." She further noted TDF's history of depression as well as "hearing voices," referenced the family history of these psychological issues, and reported that with the medication his doctors had described that "he's doing much better" in these areas. She rated his interactions and relationships with others as "less than marked" as a result of his treatment.

After rating those three domains, Dr. O'Brien turned to the remaining three domains and testified that she did not see any difficulties in the other three domains (moving about or manipulating objects; or self-care; or health and physical well-being).[2]

On cross-examination, TDF's representative focused on testing from October 2007 (prior to TDF receiving treatment) and asked about the large gap that this testing revealed between TDF's intelligent quotient (IQ) and his achievement test scores. The representative asked if the gap demonstrated that TDF still was unable to keep up with children his age. Dr. O'Brien replied that, considering "the whole psychological evaluation, the lack of diagnosis of ADHD was really creating problems for this young man." She testified,

> "He doesn't lack the capacity to catch up. When he's properly treated and he seems to be being properly treated now, he is catching up. So the discrepancy is what I described when I said to the judge that there were reading difficulties and math difficulties and written language difficulties. So now he's stable. He's on good medications, getting good treatment and things are coming back. And he's bright enough to catch up. But even if he doesn't catch up, he's not that far behind.

The representative followed up by noting TDF's need for special education and asked if this need demonstrated that TDF was far behind his normal age peers. Dr. O'Brien responded that he still qualified for special education because he had fallen behind prior to being treated and was

---

[2] TDF does not allege any impairment in three of the domains: moving and manipulating objects; caring for oneself; and health and physical well-being.

6

still "catch[ing] up." She also noted that TDF's current Individual Educational Program (IEP) indicated that he was functioning at just below the average range when compared to the average child, not just similarly-impaired children. Dr. O'Brien added that "just below average" does not meet any listing.

2.     *Testimony of TDF's mother, Beatrice Link*

Ms. Link testified that, prior to treatment, she spent a lot of time helping TDF with his homework. However, she testified that she has "seen a big improvement with medication." She stated that while TDF "still has some problems functioning, [ ] the medicine has helped him out a lot." She noted that he still fidgets and twitches occasionally, even with the medication, and that he sometimes picks at his scalp and "can't stand loud noises." She testified that he has a couple friends that he gets along with and that he is not being teased as much at school, but that there are others that he does not like. She stated that he gets along "fine for the most part" with his siblings, but that they tease him as well. She spoke about his anger problems, noting that even with the medication, he still gets angry and it takes him a while to calm down.

Ms. Link testified that she had spoken with TDF's teacher, Ms. Cook, and that Ms. Cook said that TDF was doing "much better this year." Ms. Cook also told Ms. Link that she can tell when TDF does not take his medicine. Ms. Cook noted that even with the medication, the teachers still give him little breaks during the day, when he starts to act fidgety, to allow him to move around and refocus on the tasks at hand.

The ALJ asked Ms. Link if TDF's siblings had experienced similar difficulties. Ms. Link noted that they had, particularly her older son, whom she agreed was "underachieving." The ALJ inquired whether she believed that TDF was picking up bad habits from his older brother and taking social cues from him as to how to behave. Ms. Link said "somewhat," but noted that

7

TDF was different than his brother because TDF also notices that something seems wrong with his older brother.[3]

### D. The ALJ's Findings

The ALJ found that TDF had not engaged in substantial gainful activity at any time material to this decision and further acknowledged that TDF had at least one medically determinable "severe" impairment because he suffers from ADHD, a depressive disorder, and learning disorders in reading, writing, and mathematics. However, the ALJ determined that TDF did not have an impairment or combination of impairments that met or medically equaled any impairment described in the Listing of Impairments. The ALJ also found that TDF did not have an impairment or combination of impairments that "functionally equals the listings." The ALJ concluded that TDF did not have an impairment or combination of impairments that resulted in marked limitations in two domains of functioning or severe or "extreme" limitation in one domain and thus was not disabled with the meaning of the Social Security Act.

## III. Standard of Review

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. See *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as

---

[3] In her brief, Ms. Link claims that TDF is "paranoid and fearful," "afraid of the dark," and "is afraid of going places by himself, including in the house." She also said that she "even caught TDF cutting himself." Her brief does not say whether these symptoms were present before or after TDF began treatment. Additionally, while the medical records (and Ms. Link) noted that TDF occasionally hears voices, Ms. Link did not mention these issues during her testimony and none of these symptoms were noted in the medical records presented to the ALJ.

8

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486 (7th Cir. 2007); see also *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). But if the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," a remand is required. *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). An ALJ must articulate, at a minimum, her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. See *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001).

**IV.    Disability Standard**

A child is disabled under the Social Security Act and regulations if he has a "physical or mental impairment, which results in marked and severe functional limitations, and * * * has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). Whether a child meets this definition is determined via a multi-step inquiry. 20 C.F.R. § 416.924(a); *Murphy v. Astrue,* 496 F.3d 630, 633 (7th Cir. 2007); *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486–87 (7th Cir. 2007). The first step is to determine whether the child is engaged in substantially gainful activity, and if he or she is, then the claim will be

denied. 20 C.F.R. § 416.924(a); *Murphy,* 496 F.3d at 633; *Giles,* 483 F.3d at 486. A child is engaged in substantially gainful activity if he or she is doing significant physical or mental activities for pay or profit. 20 C.F.R. § 416.972. If a child is not engaged in substantially gainful activity, the next consideration is whether the child's physical or mental impairments are severe. 20 C.F.R. § 416.924(a). If he does not have a medically severe impairment or combination of impairments, his claim will be denied. *Murphy,* 496 F.3d at 633; *Giles,* 483 F.3d at 486. Finally*,* if the child's impairment or combination of impairments is severe, then the next consideration is whether that impairment meets or is functionally equivalent to one of the listings of impairments in 20 C.F.R. Pt. 404 Subpt. P App. 1; *Murphy,* 496 F.3d at 633; *Giles,* 483 F.3d at 486–87.

To determine whether an impairment is the functional equivalent of a listing, the ALJ must evaluate the combine effects of all medically determinable impairments, even those that are not severe. The determination of functional equivalency involves a further analysis of the child's condition in the context of six "domains" or categories, from an age-appropriate standpoint: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(a), (b)(1); *Murphy,* 496 F.3d at 633; *Giles,* 483 F.3d at 487. In assessing these categories, how appropriately, effectively, and independently the child performs activities is compared to the performance of other children at the same age who do not have impairments. 20 C.F.R. § 416.926a(b)(1). A child's impairment is functionally equivalent to the listings, meaning the child qualifies for benefits, if the ALJ finds that he has marked difficulty in two domains of functioning or an extreme limitation in one. 20 C.F.R. § 416.926a(a); *Murphy,* 496 F.3d at 633; *Giles,* 483 F.3d at 487. A marked limitation is one which

10

interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(I); *Giles,* 483 F.3d at 487. It is further defined as "more than moderate, but less than extreme," and can be demonstrated by standardized test "scores that are at least two, but less than three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(I). An extreme limitation is present where the results of a standardized test are three or more standard deviations below the norm for the test, or when an impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. See 20 C.F.R. § 416.926a(e)(3).

The evidence relevant to whether a child's limitations are marked or extreme involves both medical and non-medical sources. 20 C.F.R. § 416.924a(b)(3). The latter may include information from parents, teachers, and other people who know the child, and their descriptions of relevant activities in school, at home, or in the community. 20 C.F.R. §§ 416.924a(b)(3), (e); see also *Ferguson ex rel. A.F. v. Astrue*, 2013 WL 788089, at *13 (N.D. Ill. Mar. 1, 2013).

**V.     Analysis**

The overall thrust of the ALJ's evaluation of TDF's impairments and functioning, based on the record before him at the time of his decision, is that TDF's impulsivity, hyperactivity, inattention, and anger are significantly improved and well-controlled by medication. He does well while on medication but lacks focus and has trouble controlling his behavior without it. Since late 2007 or early 2008, and more importantly, for the year leading up to the hearing, TDF has been treated with counseling and medication and every source in the record, including his mother, notes significant improvement since he was diagnosed with and began taking medication for ADHD. As set forth below, the evidence adequately supports the ALJ's conclusion.

11

Although Ms. Link contests the determination that TDF is not disabled, she does not point to any particular line of evidence that the ALJ failed to consider when making that determination. Contrary to her contentions, in reaching his conclusion that TDF was not eligible for supplemental security income benefits, the ALJ relied extensively on the written record before him as well as the hearing testimony. The ALJ referred to the testimony of the medical expert, Dr. O'Brien, who opined that TDF had no limitations in three of the six domains: moving about and manipulating objects; ability to care for onself; and health and physical well-being. Indeed, neither TDF nor his mother alleged that TDF had any limitations in these domains. Dr. O'Brien rated TDF as "less than marked" in the domain of acquiring and using information; "less than marked" in the domain of attending and completing tasks; and as "less than marked" in the domain of interacting and relating with others. Additionally, when cross-examined by TDF's representative at the administrative hearing, Dr. O'Brien testified that according to TDF's most recent IEP, TDF was functioning at "just below the average range" and that just below average did not suffice for meeting or equaling any listing. In short, Dr. O'Brien, testified that TDF did not meet or functionally equal the requirements of the listings. Instead, according to Dr. O'Brien, TDF was much closer to functioning in the average range or as an average school-age child than he was to functioning as a child who could be found disabled under the listings. In addition to Dr. O'Brien, both of the state agency psychologists who reviewed the record, Dr. Lanier and Dr. Mehr, found that TDF could not meet or functionally equal any of the impairments described in the Listings of Impairments.

The ALJ also evaluated the treatment records from TDF's visits to University of Illinois Hospital—at Chicago, as well as his evaluation and partial hospitalization at Riverside Medical Center, which were precipitated by behavioral problems at school and which led to prescriptions

(Luvox and Concerta) and outpatient therapy for the treatment of ADHD. The ALJ discussed various school records documenting TDF's behavior in 2007—uncontrolled outbursts, difficultly with school work, negative peer relationships, and an inability to stay organized—and the marked improvement in his behavior toward school work and classmates as well as his academic progress, in 2008 and 2009, once he began taking medication. He cited the testimony of Ms. Link, in which she discussed the degree of dysfunction that TDF experience before and after taking medication and noted significant improvement following treatment; but he also acknowledged reports from Ms. Link that in 2007, TDF's siblings teased him, that a distant family relative (her niece's son) had committed suicide in September 2007 and TDF's behavior significantly worsened after the event, and that TDF heard voices telling him to kill others and himself. The episodes in 2007 occurred prior to, and really precipitated, the beginning of TDF's treatment in late 2007.

The record consistently demonstrated that after TDF was diagnosed with ADHD and started taking medications, he improved. In his decision, the ALJ noted that TDF started taking medication sometime after an evaluation done by Dr. Roy in November 2007, during which she diagnosed ADHD and recommended medication. He further noted that in March 11, 2008, Jeffery Cox, TDF's fourth grade teacher, reported that TDF had improved "a great deal" in the domains of acquiring and using information and attending and completing tasks since he started taking medication. Mr. Cox made similar observations in a narrative statement. Mr. Cox noted that when TDF returned to school, he had started on medications and that Mr. Cox immediately noticed a difference in TDF's ability to focus. The biggest improvement that Mr. Cox noted, however, was in TDF's interactions with his peers. After describing some outbursts that TDF

had prior to taking medications, Mr. Cox reported that since his return, TDF had not engaged in a single negative interaction with a classmate.

The psycho-educational evaluation in April 2008 with the school psychologist (Mr. Malliett), was not specifically discussed by the ALJ but its results were referenced by the ALJ in his decision and further supports his findings. Testing showed that TDF's academic achievement was in the average range in math calculation skills, and his reading ability was comparable to that of the average individual at age 8-6 (TDF was 9 years, 10 months old at the time of testing). In his summary, Mr. Malliett wrote that TDF's academic skills were in the average range of others at his age level. Mr. Malliett also reported that when compared to others at his age level, TDF's performance was average in mathematics and math calculation skills; low average in broad reading and written expression; and low in written language.

From 2008 onward, the record demonstrates that TDF functioned either in the average range or just below it. On the whole, the ALJ addressed the pertinent evidence and evaluated it against the requirements of the relevant listings. There simply is not sufficient evidence in the record that contradicts the ALJ's determination that TDF did not have an impairment or combination of impairments that resulted in marked and severe functional limitations.

One final point is worth noting. Although neither side addressed this issue, the Court notes that the ALJ did not expressly give an opinion regarding Ms. Link's credibility—as in, stating expressly that he found her credible, or not. However, the lack of an express discussion regarding the credibility of the child's guardian in a child disability case is not erroneous or a reason for remand when there is no indication that the ALJ discredited the guardian's testimony. See *Hilson v. Barnhart,* 64 Fed. Appx. 134, 136 (10th Cir. 2003) (unpublished). Moreover, the ALJ's discussion of TDF's educational and medical records reflects his

14

consideration of the mother's observations and opinions regarding her child's functioning. In fact, throughout his opinion he references her testimony and her reports to TDF's teachers and providers in conjunction with his analysis of the medical records and testimony of the medical expert. And most importantly, while not expressly giving an opinion about Ms. Link's credibility, the ALJ noted toward the end of his opinion:

> The record reflects that the claimant's mother, initially unaware of significant impairments the claimant was exhibiting in school, sought appropriate intervention for the claimant. Perhaps because he perceived parental indifference, the claimant's teacher emphasized how serious the claimant's impairments were in three of the six domains pertinent to a child in the claimant's age group. Perhaps because of her awareness of the seriousness of the claimant's problems, and the emphasis placed upon them by the claimant's teacher, the claimant's mother, understandably, has perceived the claimant to be more functionally limited than has been demonstrated. She should be commended for her actions on the claimant's behalf in this matter.

The ALJ's conclusion that TDF's limitations were less than marked and not severe does not reject or discredit Ms. Link's hearing testimony; rather, the decision reflects that he properly considered her testimony. Indeed, Ms. Link's testimony comports with all of the other evidence: that she, like his teachers and the medical expert, has seen a "big improvement with medication," and that while TDF "still has some problems functioning, [ ] the medicine has helped him out a lot." The ALJ's evaluation of the TDF's impairments and functioning comports with the record evidence that TDF's impulsivity, hyperactivity, inattention, and otherwise poor control of his behavior are significantly improved and controlled by medication.

## VI. Conclusion

For the foregoing reasons, the Court finds that the decision of the Administrative Law Judge is supported by substantial evidence and does not contain any errors of law. Therefore, the Court grants the Commissioner's motion [37] and affirms the decision of the Administrative Law Judge. Judgment will be entered in favor of Defendant Carolyn Colvin and against Plaintiff Beatrice Link.

Dated: November 7, 2013 _____
Robert M. Dow, Jr.
United States District Judge